UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Darren Starr,
        Plaintiff

        v.                                  Civil No. 04-cv-02-SM
                                            Opinion No. 2006 DNH 110
Bruce Cattell, Warden of the
Northern New Hampshire
Correctional Facility, et al.,

**O R D E R**

Darren Starr, an inmate at the Northern Correctional Facility in Berlin, New Hampshire ("NCF"), brings this action seeking compensatory and punitive damages, as well as declaratory and injunctive relief, for what he says was the wrongful denial of his constitutionally protected rights. Specifically, Starr claims defendants unlawfully prohibited him from obtaining a marriage license and, for a period of at least 18 months, prevented him from marrying his girlfriend. Defendants deny that they violated Starr's constitutional rights and, because they have changed their policy governing inmates' access to marriage licenses, they say his claims are moot. Pending before the court are the parties' cross-motions for summary judgment.

For the reasons set forth below, defendants' motion for summary judgment (document no. 86) is granted and plaintiff's motion for summary judgment (document no. 95) is denied.

**Standard of Review**

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." <u>Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Background**

Prior to 2002, when inmates at NCF (including those classified as C-3 status and higher) wished to marry, staff at NCF would transport them to the local town hall to obtain the

necessary state marriage license.[1] Subsequently, however, that policy changed. The Department of Corrections determined that, for security reasons, it would no longer transport C-3 inmates outside the prison to obtain marriage licenses. Officials at the Department of Corrections also interpreted state law (probably erroneously) to prohibit the transportation of C-3 inmates outside the prison to obtain marriage licenses. <u>See generally</u> N.H. Rev. Stat. Ann. 623:1. Consequently, defendants say they viewed the change in policy as being both counseled by security concerns and mandated by statute.

In July of 2000, Starr was committed to NCF and classified as a "C-3" inmate. He is not eligible for "C-2" status for several years. In October of 2002, Starr and his girlfriend decided to wed. Accordingly, he asked NCF officials to arrange for his transportation to the local town clerk, so he might complete the necessary paperwork and obtain a marriage license. He was told that, as a C-3 inmate, he was not eligible for transportation to the town clerk's office. Nevertheless, officials at NCF contacted several town clerks from neighboring communities and asked if they would be willing to come to NCF so

---

[1] The term C-3 refers to an inmate's custody classification level, which can range from C-1 (minimum) to C-5 (maximum).

Starr might fill out the appropriate paperwork and obtain a marriage license. All declined. Starr was then informed that he would have to wait until he was designated a C-2 inmate before he would be eligible for transportation out of the prison to obtain a marriage license.

Approximately 18 months later, in April of 2005, officials at NCF changed the policy concerning C-3 inmates and marriage licenses. Because they had been unable to find a local town clerk willing to come to NCF to assist inmates in obtaining licenses, officials at NCF decided that they would transport inmates to the correctional facility in Concord, twice each year, where a town clerk would come in to assist inmates. That same month, NCF officials informed Starr of the change in policy and asked if he wanted to be placed on the list of inmates seeking transportation to Concord to obtain a marriage license. Starr declined, saying he preferred to wait until the fall.

In January of 2006, Starr and his fiance broke off their engagement. Nevertheless, he says he is still entitled to damages as compensation for the roughly 18 months that he was denied the opportunity to obtain a marriage license.

**Discussion**

I.  Inmates and the Right to Marry.

In 1987, the Supreme Court held that, despite incarceration, inmates retained the constitutionally protected right to marry. Turner v. Safley, 482 U.S. 78, 96 (1987).  The Court recognized, however, that an inmate's right to marry is, "like many other rights, . . . . subject to substantial restrictions as a result of incarceration."  Id. at 95.

When a correctional facility's regulations interfere with an inmate's constitutionally protected right to marry, such regulations are valid only if they are "reasonably related to legitimate penological interests."  Id. at 89.  To assist lower courts in determining whether a challenged regulation passes constitutional scrutiny, the Court identified four factors that should be considered:

   1.   whether there is a logical, valid connection
        between the regulation and the penological
        goal(s) sought to be advanced by that
        regulation – a connection that is not so
        remote as to render the policy arbitrary or
        irrational;

   2.   whether there are alternate means by which
        the inmate might exercise the asserted
        constitutional right – means that remain open
        to him despite his incarceration;

    3.    whether the accommodation requested by the inmate so that he might exercise the asserted constitutional right would have an adverse effect on guards, other inmates, and/or the allocation of prison resources; and, finally,

    4.    whether there are any obvious, easy alternate means by which the prison might accommodate the inmate's exercise of the asserted right.

See Id. at 89-92.  Importantly, however, the Supreme Court urged lower courts to exercise restraint and give appropriate deference to the expert judgments of prison administrators.

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.  Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

Id. at 84-85.


II.  The NCF Policy.

Evaluated in light of the four factors identified by the Turner court, NCF's former policy of not transporting C-3 inmates to the local town clerk's office did not violate Starr's constitutionally protected right to marry his fiancé.  First, it

6

is important to note that NCF did not have a policy that prohibited C-3 status inmates (like Starr) from getting married. Instead, the challenged policy provided that NCF staff would not transport C-3 status (or higher) inmates outside the prison to the local town clerk's office. Consequently, C-3 status inmates who wished to obtain a marriage license would have to arrange (or NCF staff would have to arrange) for a local town clerk to come to the prison. The articulated justification for the policy — to eliminate security risks associated with transporting C-3 status (and higher) inmates outside the confines of the prison and into a public place — was both reasonable and compelling.

Moreover, the accommodation sought by Starr – transportation out of the prison and to the local town clerk's office – would have had an adverse effect on NCF guards and the allocation of prison resources. Plainly, when an inmate (particularly one who has been classified as C-3 status or higher) is transported outside the confines of the prison, numerous security measures must be implemented. That is particularly true when the inmate is being transported to a public place, rather than another correctional facility. Finally, when NCF officials denied Starr's request to be transported to the town clerk's office, there were no obvious, easy alternatives by which NCF officials

could accommodate his desire to obtain a marriage license. During the period in question, NCF officials made repeated inquiries of local town clerks in the neighboring communities to see if any were willing to come to the prison.  None volunteered. And, while NCF officials eventually decided that they could accommodate Starr's request by transporting him to the prison in Concord (where a town clerk had volunteered to assist inmates seeking marriage licenses), that solution was not so obvious or self-evident that it occurred to either Starr or defendants when Starr made his initial request.  If Starr had actually suggested that NCF officials transport him to the prison in Concord, and if those officials had refused such a request, this might be a different case.  But he did not.

In support of his claims, Starr suggests that when he asked NCF officials to transport him to the local town clerk's office, he was no different than an inmate who was ill and needed medical treatment at a local hospital.  That is to say, Starr suggests that, just as NCF officials have a constitutional obligation to transport ailing inmates to a local hospital if they cannot receive adequate treatment within the confines of the prison, NCF officials have an analogous constitutional obligation to transport inmates seeking a marriage license to a local town

clerk if they cannot obtain such a license within the prison itself.

Simply stated, Starr reads too much into the precedent on which he relies. The Turner Court held that, absent the advancement of legitimate penological objectives, prison officials cannot prohibit inmates from marrying. Importantly, the Court did not hold that prisons have a constitutionally mandated obligation to affirmatively assist inmates in their efforts to wed.

To be sure, Starr does point the court to an opinion in which the Court of Appeals for the Sixth Circuit held that:

> Turner's test extends to situations in which an inmate's right to marry will be completely frustrated without prison officials' affirmative assistance. Although it was not previously clearly established, we now hold that the distinction between actively prohibiting an inmates's exercise of his right to marry and failing to assist is untenable in a case in which the inmate's right will be completely frustrated without officials' involvement. Therefore, where an inmate will be unable to marry without prison officials' affirmative assistance, Turner's strictures apply.

Toms v. Taft, 338 F.3d 519, 526-27 (6th Cir. 2003). Importantly, however, even if the court assumes that Toms accurately describes

the law in this circuit, a prison official's refusal to affirmatively assist an inmate in his or her efforts to marry is still subject to the Turner analysis.  That is to say, if a prison official's refusal to assist the inmate is grounded in a policy justified by legitimate penological goals, is neither unreasonable nor arbitrary, and there are no obvious, easy alternate means by which the inmate might achieve his or her objective, the policy will survive constitutional scrutiny.  Such is the case here, where NCF officials based their refusal to transport Starr on a policy that was uniformly applied, was reasonably related to legitimate penological concerns, and there were no ready alternate means by which they might accommodate Starr's desire to marry his fiancé.  In fact, NCF officials affirmatively explored such an alternative – attempting to identify a town clerk willing to come to the prison – but were unsuccessful.

     Given the undisputed facts of this case, as a matter of law, defendants did not violate Starr's constitutionally protected right to marry by denying his request for transportation out of the prison and to the local town clerk's office.

III. Qualified Immunity.

Even if defendants had a constitutionally mandated obligation to affirmatively assist Starr in his efforts to obtain a marriage license, and even if they breached that obligation (and, thus, violated his constitutionally protected rights), they still would be entitled to the protections afforded by qualified immunity.

A government official is entitled to qualified immunity from personal liability if the challenged "'conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Aversa v. United States, 99 F.3d 1200, 1214 (1st Cir. 1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The challenged conduct is measured by a standard of objective reasonableness, that is: "Could an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the plaintiff['s] constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?" Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996).  And, as the Court of Appeals for the First Circuit has observed,

> To determine a defendant's eligibility for qualified immunity, courts must define the right asserted by the plaintiff at an appropriate level of generality and ask whether, so characterized, that right was clearly established when the harm-inducing conduct allegedly took place. This does not mean that a right is clearly established only if there is precedent of considerable factual similarity. It does mean, however, that the law must have <u>defined the right in a quite specific manner</u>, and that the announcement of the rule establishing the right must have been <u>unambiguous and widespread</u>, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials. After all, qualified immunity for public officials serves important societal purposes, and it is therefore meant to protect all but the plainly incompetent or those who knowingly violate the law.

<u>Brady v. Dill</u>, 187 F.3d 104, 115-16 (1st Cir. 1999) (citations and internal quotation marks omitted) (emphasis supplied).

Importantly, as suggested in <u>Dill</u>, a defendant does not lose the protection of qualified immunity if he or she acts mistakenly, as long as the mistake was objectively reasonable, as qualified immunity is intended to protect "'all but the plainly incompetent or those who knowingly violate the law.'" <u>Veilleux v. Perschau</u>, 101 F.3d 1, 3 (1st Cir. 1996) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

A preliminary question, then, is whether Starr's asserted constitutional right – to have NCF officials provide him with

transportation to the local clerk's office so he might obtain a marriage license – was "clearly established" in 2003. It was not. As the Court of Appeals for the Sixth Circuit noted in July of 2003 (shortly before Starr made his request for transportation to the clerk's office), the case law at that time "fail[ed] to show that an inmate's right to marry was so clearly established that an official reasonably would believe that declining to assist an inmate in obtaining a marriage license is unconstitutional." Toms, 338 F.3d at 526. While the Toms court went on to hold that, in future cases, prison officials in the Sixth Circuit would be required to affirmatively assist inmates' efforts to marry (absent justification that passes muster under the Turner factors), that single judicial opinion can hardly be said to have "clearly established" the constitutional principle on which Starr's claims turn. In short, in 2003, the notion that prison officials have a constitutionally imposed obligation to affirmatively assist inmates in their efforts to marry was neither "unambiguous" nor was it "widespread." Dill, 187 F.3d at 116. See, e.g., Beasley v. Konteh, 433 F. Supp. 2d 874, 877 (N.D. Ohio 2006) ("Thus, prison officials need not affirmatively assist inmates by allowing them to leave prison temporarily to accomplish a lawful objective that implicates a constitutional right, such as the right to marry.").

Here, the principle of law on which Starr's claims hinge was not so well-established and widespread that one could plausibly conclude that a reasonable and well-trained prison official in defendants' position would have known that his or her decision not to transport Starr would violate his constitutional rights. Stated somewhat differently, given the state of the law at the time, the record establishes that defendants were not "plainly incompetent," nor did they "knowingly violate the law" when they denied Starr's request for transportation to the town clerk's office. Veilleux, 101 F.3d at 3.

## Conclusion

This case presents a somewhat unusual situation – Starr complains that, by refusing to transport him outside the confines of the prison, defendants effectively prevented him from exercising his constitutionally protected right to marry. In other words, although defendants never had a policy that prohibited inmates from marrying, Starr claims they violated his constitutionally protected rights by failing to affirmatively assist him in exercising that right – that is, by refusing to transport him to the local town clerk's office. The difficulty with Starr's claim is this: while the Supreme Court made clear that correctional officials cannot unreasonably prohibit an

14

inmate from exercising the constitutionally protected right to marry, there is scant support in the case law for the proposition that those officials can be liable for <u>failing to assist</u> an inmate in exercising that right – Starr points only to <u>Toms</u>, a single judicial opinion.  And, even applying the principles of law articulated in the <u>Toms</u> opinion to the case at hand, defendants are still entitled to judgment as a matter of law. The decision not to honor Starr's request for transportation to the local town clerk's office was grounded in a prison policy that met the test articulated in <u>Turner</u>.

Finally, even if defendants had violated Starr's constitutionally protected rights by refusing to transport him to the local town clerk's office, they would still be entitled to the protections afforded by qualified immunity.  When defendants refused Starr's request, an inmate's right (if any) to affirmative assistance from prison officials in order to exercise the right to marry was not "clearly established" in this circuit.

For the foregoing reasons, as well as those set forth in defendants' memoranda, defendants' motion for summary judgment (document no. 86) is granted and plaintiff's motion for summary

judgment (document no. 95) is denied.  The parties' motions in limine (documents no. 99 and 103) are denied as moot.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 27, 2006

cc:  Darren Starr, pro se
     Mary E. Maloney, Esq.